UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| In re | : | Chapter 13 |
| NANCY M. KING | : | |
| Debtor | : | Bankruptcy No. 06-10711bif |

.................................................

MEMORANDUM

.................................................

Secured creditor Midfirst Bank has filed a motion to dismiss the above-captioned chapter 13 bankruptcy case of Nancy M. King with prejudice, as filed in bad faith.  In support of its motion, Midfirst states that Mrs. King's recent chapter 13 filing was preceded by three unsuccessful chapter 13 cases filed by her husband, Mr. Spurgeon King, and that Mr. King failed to make plan payments and postpetition mortgage payments during those cases.  Attributing those three unsuccessful filings to the debtor, Midfirst Bank seeks dismissal with prejudice, with both the debtor and her husband barred from refiling for a period of 180 days from the dismissal.

At the conclusion of the evidentiary hearing, the chapter 13 trustee supported dismissal of this case as a bad faith filing.  Mrs. King, however, opposes dismissal and maintains that she was not aware of two of her husband's prior filings, that she and her husband are separated pending divorce, and that her present income, coupled with alimony pendente lite payments from her husband, are more than adequate for reorganization.

The issue is now ripe for adjudication.  I conclude, although a close question, that the present motion to dismiss should be denied.

I.

At an evidentiary hearing held May 30, 2006, the following relevant facts were adduced:

Mrs. King filed a voluntary petition under chapter 13 on February 24, 2006. Ex. M-6.  She filed to stop a sheriff's sale of her property, which her Statement of Financial Affairs reveals was scheduled for March 16, 2006.  Hearing at 4:20;[1] Ex. M-9.

Mrs. King testified that she works as a phlebotomist (viz., she draws blood from patients) for Brookside Clinical Laboratories.  Hearing at 4:16.  She most likely has been employed there since April 2005.  Hearing at 4:13.[2]

She disclosed on her bankruptcy schedules a monthly gross wage of $1,906.66 plus $163.38 in estimated monthly overtime, with a net monthly income of $1,807.38 after payroll deductions.  Ex. M-9 (Schedule I).  She testified however that her gross wages were actually lower—approximately $500-$715 every two weeks (up to 65 hours at $11/hour)—that her hours of employment fluctuate, and that overtime pay was sporadic.  Hearing at 4:16.  However, she further testified that the income disclosure on her bankruptcy schedules omitted inclusion of a mileage reimbursement benefit of 40¢ per mile, which would yield from $100 to as much as $500 per month.  Hearing at 4:19.

_____

[1]All references to the hearing will be to the audio recording of the hearing that took place on May 30, 2006, denoting the hour and minute at which the testimony took place.

[2]Mrs. King's Schedule I discloses that she has worked at Brookside for only nine months (and incorrectly states she is a receptionist).  Ex. M-9.  In testimony, she said she had been with her current employer since February.  Hearing at 4:13.  However, the Schedule I filed in Mr. King's latest case in May 2005 disclosed that his wife had been working as a phlebotomist at "Brookstone" for one month, ex. M-11, and Mrs. King later confirmed that she had worked at Brookside at that time.  Hearing at 4:28.

2

Mrs. King's disclosed monthly income also includes $1,178.47 in alimony pendente lite payments from Mr. King.[3]  Ex. M-9 (Schedule I).  These payments began in March 2006.  Hearing at 4:22.  Mr. King had only made one of three of these payments required by the time of the hearing.  Id.  Mrs. King proposes to garnish his wages to ensure that she receives the payments.  See generally 42 Pa. C.S.A. § 8121(a).  Hearing at 4:30.  Mr. King works as a police officer, and also is self-employed as a contractor. Hearing at 4:30.[4]

Mrs. King pays $850 per month on her mortgage, including real estate taxes and property insurance.  Ex. M-9 (Schedule J).  She testified that her electricity and heating fuel costs probably average a "little less" than the $180 disclosed, and that her water and sewer bill averages $72 rather than the $160 reported on her schedule.  Id.; hearing at 4:42-4:43.  She confirmed that her monthly food expense is only $280 per month for herself and her two teenaged children.  Ex. M-9 (Schedule J); Hearing at 4:18. A third child, a 20-year old daughter, is in college and lives at the home only during school breaks.  Hearing at 4:09.  Mrs. King disclosed no expenses for clothing or medical. She explained that her children receive most of their clothing from their grandparents, and that she wears uniforms to work.  Hearing at 4:43.  Mr. King's employer provides health insurance, although Mrs. King admitted that still leaves her responsible for any co-pays.

---

[3]Alimony pendente lite is defined as "[a]n order for temporary support granted to a spouse during the pendency of a divorce or annulment proceeding."  23 Pa. C.S.A. § 3103.

[4]Mr. King's Schedule J in his third case identifies his business as "King Enterprises."  Ex. M-11.  His Schedule J in his first and second cases identify the business as "Pest Control."  Exs. M-13, M-14.  Mrs. King implied that this business may have been the source of their financial problems, with her husband failing to pay taxes on his construction income and developing problems with the Internal Revenue Service.  She contends that those problems do not extend to her.  Hearing at 4:33.

Id. The debtor no longer makes the scheduled $493.46 monthly auto loan payments, as she paid the car off with proceeds of a lawsuit settlement. Hearing at 4:45.

She had disclosed that lawsuit as personal property on Schedule B as having a value of $19,000. Ex. M-9.[5] Moreover, she also testified that she still has $6,000 from those settlement proceeds. Hearing at 4:37. She scheduled no priority debts, but $26,962.00 in unsecured, nonpriority claims, mostly credit card debt. Id. (Schedule F). Proofs of claim filed in the case so far reflect a total of $11,415.56 in unsecured claims. Mr. King is listed as a co-debtor on most of the claims. Id. (Schedule H).

Mrs. King's schedules also reveal two secured debts, one on her 2001 Mazda Millenia (as just noted, paid off postpetition) and the other on her residence at 624 Felton Avenue, Philadelphia, Pennsylvania. Ex. M-9 (Schedule D). The latter derives from a mortgage entered into by Mr. and Mrs. King on October 28, 1986. See Ex. M-8. Under the terms of the mortgage, the Kings received $61,500 to be repaid over 30 years at a rate of nine and one half percent. Id. Monthly payments began at $517.13. Id. Two or three years after entering into this obligation, the Kings transferred ownership of the property into Mrs. King's name only. Hearing at 4:10. On November 20, 2003, Midfirst initiated a suit in foreclosure. Ex. M-2. The bankruptcy filings of Mr. and Mrs. King have stayed the completion of that foreclosure litigation. See id. Midfirst's proof of claim filed in this case asserts a total secured claim of $56,560.84, with $44,919.36 owed in arrears.

---

[5] The chapter 13 trustee filed an objection to the debtor's full exemption of the lawsuit proceeds on May 2, 2006.

Another proof of claim was filed by Citadel Federal Credit Union affirming a secured claim of $1,573.93 for money loaned on real estate.  This debt allegedly arose on September 3, 1999.  The proof of claim did not include any supporting documents.  Mrs. King did not disclose any debt owed to Citadel on her bankruptcy schedules.

As reflected on Schedule J, Mrs. King has projected monthly net income of $567.39.  Ex. M-9.  She proposes to devote $567 each month for 60 months to her chapter 13 plan, intending to cure her prepetition mortgage delinquency while continuing to make post-bankruptcy monthly mortgage payments directly to the mortgagee.  Ex. M-10.  <u>See generally</u> 11 U.S.C. § 1322(b)(5).  Mrs. King stated that she was current on both plan and postpetition mortgage payments.  Hearing at 4:31; <u>see</u> <u>also</u> Exs. M-1, M-15.

Mr. King first filed for bankruptcy in this court on February 10, 2004, docketed at Bankr. No. 04-11916.  Ex. M-3.  Mrs. King was aware of this bankruptcy filing.  Hearing at 4:12.  The case was dismissed on July 20, 2004, on the chapter 13 trustee's motion for failure to make plan payments.  <u>See</u> Ex. M-3.

Mr. King filed his next chapter 13 case on October 14, 2004, docketed at Bankr. No. 04-33844.  Ex. M-4.  Mrs. King testified that she was not aware of this filing as the couple was separating at the time and therefore not communicating—in fact, Mr. King alternated residing between his mother's home and the basement area of the Felton Avenue realty.  Hearing at 4:24.  Midfirst Bank filed a proof of claim in that case, asserting a total secured claim of $56,560.84 and arrears of $32,645.04.  Ex. M-7.  The principal balance on the loan at that time was claimed to be $46,142.65.  This case was dismissed on March 8, 2005, on the chapter 13 trustee's motion for failure to make plan payments and failure to attend the section 341 meeting.  <u>See</u> Ex. M-4.

On April 2, 2005, Mr. King filed a third chapter 13 case, docketed at Bankr. No. 05-14448. Ex. M-5. Again, Mrs. King states she was unaware of this filing due to the couple's separation. Hearing at 4:24. This case was dismissed on August 11, 2005 on the chapter 13 trustee's motion for failure to make plan payments. See Ex. M-5. In all of these cases, Mr. King was represented by the same attorney, different from the one retained by Mrs. King in the instant case. See Exs. M-3, M-4, M-5 and M-6.

In the first two cases, Mr. King proposed to pay $250 per month for 60 months into his chapter 13 plan. Exs. M-12, M-14. In the third case, he promised to increase the monthly plan payments to $500. Ex. M-16. Mrs. King's income was disclosed by her husband's bankruptcy schedules and included in his computation of disposable income available for reorganization purposes; however, she testified that her paycheck was actually used by her solely to pay her car payment and then for discretionary expenses, suggesting that her husband's income alone was responsible for mortgage payments and his chapter 13 plan payments. Hearing at 4:48.

Mrs. King argues that though she was aware of Mr. King's first bankruptcy filing, she was not aware of his second and third filings, and therefore should not have those filings imputed to her. Mr. King had taken responsibility for paying the family expenses during their marriage, therefore she did not know how serious the mortgage delinquency had become until just recently. Hearing at 4:11. She contends her chapter 13 plan is feasible because her employment income plus the alimony pendente lite received from Mr. King—which can be garnished in order to guarantee its receipt—is sufficient to pay $567 per month. In support of this contention, the debtor observes that

6

since the filing of this case, she has been current on her trustee and mortgage payments despite Mr. King missing two support payments.

Midfirst argues that because Mrs. King is obligated on the mortgage and has owned and resided in the property, all of the prior filings benefitted her and therefore should be imputed to her.  In addition, her income was included in Mr. King's prior filings in an effort to render feasible his proposed reorganization plans.  Furthermore, the mortgagee observes that the arrearage to be paid through the plan should be greater than the $32,000 owed at the time of the last filing; thus paying $567 for five years, totaling $34,020, will be insufficient.

The creditor also notes that Mrs. King's income fluctuates, and Mr. King cannot be relied upon to tender his alimony pendente lite payments, considering he had already missed two of the three owed at the time of the hearing.  Thus, the mortgagee contends that there is insufficient evidence that Mrs. King can successfully reorganize in this chapter 13 case.

The chapter 13 trustee agrees that all three prior bankruptcy filings of Mr. King should be imputed to Mrs. King,  He is also concerned with the discrepancies between Mrs. King's testimony and bankruptcy schedules, which renders it difficult to determine whether it is possible for her to reorganize under chapter 13 by curing her pre-bankruptcy mortgage arrearage.[6]

---

[6]The trustee has since filed his own motion to dismiss asserting lack of feasibility and inaccurate bankruptcy schedules.  See docket entry #21.

II.

Distinct from the requirement found in section 1325(a)(3)—that a chapter 13 plan be proposed in good faith—is the requirement implicitly found in section 1307(c): that the chapter 13 case be filed in good faith.  See, e.g., Matter of Smith, 848 F.2d 813, 816 n.3 (7th Cir. 1988); In re March, 83 B.R. 270, 275 (Bankr. E.D. Pa. 1988).[7]  As the Third Circuit has instructed:

> It is clear that Chapter 13 contains no explicit good faith requirement.  Section 1307(c) provides, however, that Chapter 13 petitions may be dismissed "for cause."  11 U.S.C. § 1307(c).  The Seventh, Ninth and Tenth Circuits have held that lack of good faith in filing is sufficient cause for dismissal under section 1307(c). . . .  We agree.
>
> As the Seventh Circuit has noted, however, "good faith is a term incapable of precise definition."  In re Love, 957 F.2d

_____

[7]Section 1325(a)(7), enacted by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, added the plan confirmation requirement that "the action of the debtor in filing the petition was in good faith[.]"  This provision is applicable in this 2006 bankruptcy filing.  In deciding the instant contested matter, however, I do not now decide whether the good faith analysis under section 1307(c) is identical to the standard imposed by new section 1325(a)(7).  See generally In re Tomasini, 339 B.R. 773 (Bankr. D. Utah 2006) (deciding that standards in determining good faith under different sections of the Code may differ).  At least one reported decision suggests that the standard is the same.  See In re Wagner, 2006 WL 1523058, at *5 (Bankr. E.D. Tenn. May 22, 2006) (applying section 1325(a)(7) in deciding an objection to plan confirmation by utilizing the factors applicable under section 1307(c));

One commentator has opined that the addition of section 1325(a)(7) simply evidences congressional ratification of decisions, such as In re Lilley, imposing a good faith filing requirement in all chapter 13 cases.  Norton Bankruptcy Law and Practice 2d, § 125:5 (2006).  Another interprets this statutory provision as implying that a lack of good faith filing means "that denial of confirmation, rather than dismissal, is the appropriate way to prevent such conduct."  8 Collier on Bankruptcy, ¶ 1325.07A (15th ed. rev. 2006).  Although not before me, I note that if a lack of good faith in filing a chapter 13 petition mandates a denial of confirmation, if would appear that this defect would be irremediable.  If so, a chapter 13 case in which the debtor is unable to confirm any plan warrants dismissal under section 1307(c).  See generally Carolin Corp. v. Miller, 886 F.2d 693, 700-01 (4th Cir. 1989) (reorganization futility warrants dismissal).

[1350] at 1355 [(7th Cir. 1992)].  As a result, we believe that "the good faith inquiry is a fact intensive determination better left to the discretion of the bankruptcy court."  <u>Id.</u>  We therefore join the Seventh, Ninth and Tenth Circuits in holding that the good faith of Chapter 13 filings must be assessed on a case-by-case basis in light of the totality of the circumstances. . . .  Factors relevant to the totality of the circumstances inquiry may include, among others, the following:

> the nature of the debt . . .; the timing of the petition; how the debt arose; the debtor's motive in filing the petition; how the debtor's actions affected creditors; the debtor's treatment of creditors both before and after the petition was filed; and whether the debtor has been forthcoming with the bankruptcy court and the creditors.

<u>In re Lilley</u>, 91 F.3d 491, 496 (3d Cir. 1996) (citations and footnote omitted).

As section 1307(c) has its counterpart in chapter 11 cases in section 1112(b), decisions construing section 1112(b) are germane to an interpretation of section 1307(c).  Section 1112(b) grants to a bankruptcy court the authority to dismiss a chapter 11 case, or convert a chapter 11 case to one under chapter 7, "whichever is in the best interests of creditors and the estate, for cause . . . ."  11 U.S.C. § 1112(b).  As in section 1112(b), the term "cause" found in section 1307(c) is not defined by the statute; the examples provided by subsection (c) of section 1307 are meant to be nonexclusive.  <u>In re Brown</u>, 951 F.2d 564, 572 (3d Cir. 1991);  <u>see</u> 11 U.S.C. § 102(3); <u>Hall v. Vance</u>, 887 F.2d 1041 (10th Cir. 1989); <u>In re Guevara</u>, 2004 WL 2495410, at *4 (Bankr. E.D. Pa. 2004).

Consistent with the <u>Lilley</u> explication of section 1307(c), in considering whether cause has been established, a court should consider the totality of the circumstances.  <u>See also</u> <u>Matter of Cohoes Indus. Terminal, Inc.</u>, 931 F.2d 222, 227 (2d

Cir. 1991); In re Guevara, 2004 WL 2495410, at *4 .  When a party seeks to dismiss a

chapter 13 case as filed in bad faith, and when the debtor has had prior unsuccessful

filings, as is asserted by the mortgagee in this instance, the issue of bad faith is often

considered in the context of the likelihood of the debtor's ability to reorganize, and

whether the latest bankruptcy filing is simply an attempt to forestall a creditor from

proceeding in state court.  Moreover, since the debtor was unable to reorganize

previously, the question of bad faith often focuses upon whether a material change in the

debtor's financial circumstances has occurred.

      In general, while the Code does not contain any express limitation, many

courts have recognized that it is inappropriate for a debtor to file another bankruptcy

reorganization case (under chapters 11, 12, or 13) after dismissal of an earlier one, unless

there has been a material change of circumstances which demonstrates that the second

attempt now has a possibility of success after the first had failed.  See Matter of Elmwood

Development Co., 964 F.2d 508 (5th Cir. 1992); In re Chisum, 847 F.2d 597 (9th Cir.

1988); In re Johnson, 708 F.2d 865 (2d Cir. 1983); In re Oglesby, 158 B.R. 602 (E.D. Pa.

1993); In re LeGree, 285 B.R. 615 (Bankr. E.D. Pa. 2002); In re McKissie, 103 B.R. 189,

192 (Bankr. N.D. Ill. 1989).

      When there are successive reorganization bankruptcy filings without any

material changes in circumstances, the latest filing is generally viewed as in "bad faith."

See In re Barrett, 964 F.2d 588 (6th Cir. 1992) (change in circumstances made the

debtor's successful reorganization extremely likely and the filing undertaken in good

faith).  Since the prior filings have been unsuccessful, there is little reason for the debtor

to believe that the latest case will yield any different result.  And, a bankruptcy

reorganization filing without any legitimate prospect of reorganization serves as grounds

to dismiss the case.  See, e.g., Matter of Love, 957 F.2d 1350, 1357 (7th Cir. 1992); In re

Brown, 951 F.2d at 572; Matter of Cohoes Indus. Terminal, Inc.  Moreover, the debtor's

evidentiary burden to demonstrate a material change in circumstances supporting a

reasonable possibility of reorganization increases with the number of unsuccessful prior

filings.  See In re LeGree, 285 B.R. at 620.

       Although no parties here dispute that this is Mrs. King's first bankruptcy

filing, MidFirst argues that Mr. King's prior filings should be imputed to her and

therefore she should be considered a serial filing, subject to this higher burden to establish

some prospect of reorganization.  Courts have long held that the bankruptcy filings of one

family member may be attributed to others in appropriate circumstances.  See, e.g., In re

Kinney, 51 B.R. 840 (Bankr. C.D. Cal. 1985):

> There is no question that eight of the ten bankruptcies were
> filed by the different members of the Kinney family in order
> to obtain the automatic stay as to the Compton property. Their
> concerted, intertwined efforts to prevent Imperial Bank from
> realizing on its security can be viewed as the acts of one
> entity, with many individuals carrying out these acts.
>
>          ***
>
> Here, the actions of each family member can be imputed to
> the rest of the family due to the unity of interest and concert
> of action. . . .  In the presence of such a scheme, the
> individuality of each of the debtors is blurred, revealing one
> common entity with five operatives.  Under such
> circumstances, orders binding one family member should bind
> the others as well.

Id. at 845, 846; see In re Bailey, 321 B.R. 169, 180 (Bankr. E.D. Pa. 2005) ("However, it

is the well established view of this and other courts that the actions of one family member

in filing a bankruptcy petition for the purpose of staying foreclosure of the same property

may be imputed to another family member due to a unity of interest and concert of action."); In re Ouverson, 79 B.R. 830, 833 (Bankr. N.D. Iowa 1987).

Thus, courts have also held that a chapter 13 bankruptcy filing of one spouse may be in bad faith if it follows multiple unsuccessful reorganization attempts by the other spouse with whom she resides, when the purpose of the latest petition is solely to stave off foreclosure of the family residence and there is little or no evidence of a reasonable prospect of reorganization.  See In re Felberman, 196 B.R. 678, 688 (Bankr. S.D.N.Y. 1995).

Finally, the Third Circuit Court of Appeals has instructed, when analyzing section 1112(b)—the chapter 11 provision substantially similar to section 1307(c)—that the evidentiary burden to demonstrate good faith falls on the debtor:

> Once at issue, the burden falls upon the bankruptcy petitioner
> to establish that the petition has been filed in "good faith."

In re SGL Carbon Corp., 200 F.3d 154, 162 n.10 (3d Cir. 1999) (citation omitted).  The court applied this same allocation of the evidentiary burden in a chapter 7 case.  In re Tamecki, 229 F.3d 205, 207 (3d Cir. 2000).  Due to the similarity between sections 1112(b) and 1307(c), there is little basis to doubt that the Court of Appeals for the Third Circuit would also place the burden of persuasion on this issue on the chapter 13 case debtor.  As the moving party, however, Midfirst Bank has an initial evidentiary burden of production to place the debtor's good faith in issue.  See In re SGL Carbon Corp., 200 F.3d 154, 162 n.10 (3d Cir. 1999) (moving party must place the question of good faith in issue); cf. In re Kim, 71 B.R. 1011, 1014 (Bankr. C.D. Cal. 1987) (moving party must meet some initial burden of production before shifting the burden of persuasion).  That is,

12

although the ultimate burden of persuasion rests upon the debtor, the moving creditor

must make some initial showing of bad faith to put the issue in question.

III.

As mentioned above, Midfirst Bank forcefully asserts that Mr. King's three

prior bankruptcies should be imputed to Mrs. King.  Absent her husband's previous,

unsuccessful bankruptcy cases, Midfirst Bank does not suggest any other basis to

conclude that Mrs. King commenced this case in bad faith.  Were I to consider Mrs. King

a serial filer, then Midfirst Bank's initial burden of production would be met and I would

determine whether Mrs. King has shown a material change in circumstances meriting a

new chance at chapter 13 reorganization.  Were I not to attribute Mr. King's dismissed

chapter 13 cases to Mrs. King, then it would follow that the instant bankruptcy filing was

done in good faith as there would be no evidence to the contrary.

Upon consideration of the evidence presented, while it appears that Mr.

King's bankruptcies had the effect of precluding Midfirst Bank from foreclosing upon its

collateral, his actions should not be attributed to the instant debtor spouse.

As observed earlier, the bankruptcy filings of different individuals may be

imputed to one another and considered serial filings by the same debtor if they are a

coordinated effort by these individuals to frustrate the actions of a particular creditor and

abuse the bankruptcy system.  See, e.g., In re Merchant, 256 B.R. 572 (Bankr. W.D. Pa.

2000); In re Graham, 1998 WL 473051, at *2 (Bankr. E.D. Pa. 1998);  In re Ouverson, 79

B.R. 830.  Those decisions that detect such abuse refer to a "unity of interest" *and*

13

"concert of action."   In re Kinney; In re Ouverson.   In this contested matter, while Mrs.

King had a unity of interest with her estranged husband in staying the foreclosure of her

residence, I am not persuaded on these facts that her filing bankruptcy should be

considered concerted action with Mr. King.

        I found credible Mrs. King's testimony that she was unaware of her

husband's actions, both in his extensive failure to pay the various household expenses and

his filing two additional bankruptcies in late 2004 and early 2005.  Unless she learned that

the first bankruptcy case had been dismissed, and there was no evidence that she did,[8] she

could fairly believe that all bankruptcy notices and correspondence sent to her home,

which would have been addressed to Mr. King, were connected with the earliest chapter

13 filing.  And while Mrs. King acknowledged her poor judgment in ceding to her

husband sole responsibility for household expenses, including paying the mortgagee, Mr.

King was gainfully employed throughout this period.  Mrs. King's lack of participation in

the family finances, Mr. King's absence from the home, and the couple's lack of

communication during their separation and divorce proceedings,[9] make her ignorance of

the mortgage delinquency and multiple bankruptcy filings plausible.  (Indeed, it is

possible that Mr. King is unaware of Mrs. King's present filing.)

---

      [8]The debtor also testified that her attempt to gain information from Mr. King's attorney about his bankruptcy filing were rebuffed by assertion of attorney-client privilege. Hearing at 4:32.

      [9]To further corroborate her estrangement from Mr. King, Mrs. King offered in evidence a copy of a state court support petition.  Ex. D-1.

These facts contrast with serial filing abuse cases such as <u>In re Kinney</u>, where ten bankruptcies were filed by members of the same family, and involved the same attorney in all but two.  <u>See also</u> <u>In re Ouverson</u>, 79 B.R. at 833:

> There is considerable evidence establishing Debtor's lack of good faith: this is the third bankruptcy petition Debtor has participated in since 1985; all three petitions were filed on the eve of foreclosure; one of the petitions was voluntarily dismissed at the request of the Debtor and her husband after having "stayed" the scheduled Sheriff's Sale; the Chapter 11 petition was dismissed for lack of prosecution–no disclosure statement or plan was filed; the current Chapter 12 petition was filed the same day Debtor's husband's first Chapter 12 petition was dismissed, one day prior to a scheduled Sheriff's Sale; and the Debtor and/or her husband engaged in concerted action in filing seven bankruptcy petitions over a 26-month period, which invoked the automatic stay.

That the mortgagee has suffered non-payment and has been deprived of recourse to its collateral for a considerable period deserves serious consideration, but does not by itself justify a determination of serial bankruptcy filings.  Moreover, while the obvious purpose of this latest chapter 13 petition was to save Mrs. King's home from foreclosure, filing bankruptcy to stop a sheriff sale is not presumptively bad faith.  <u>See</u> <u>Cinema Service Corp. v. Edbee Corp.</u>, 774 F.2d 584, 586 (3d Cir. 1985) ("An attempt to stop a sheriff's sale, if undertaken pursuant to a legitimate effort at reorganization, is not reprehensible and is in accord with the aim of the Bankruptcy Code."); <u>compare</u> <u>In re Hamer</u>, 2000 WL 1230496, at *8 (E.D. Pa. Aug. 18, 2000) ("[S]erial filings were not an honest attempt to reorganize debt, but were intended solely to avoid the foreclosure sale that Equity had been attempting since 1997.").

15

Contrary to the practice of her estranged husband, Mrs. King has made all of her trustee and mortgage payments thus far in the case.[10]  Compare In re Felberman, 196 B.R. at 685 (debtor and her husband had made only one mortgage payment in almost four and a half years); In re Jones, 41 B.R. 263, 266 (Bankr. C.D. Cal. 1984) (debtor had only made three mortgage payments in two and a half years).  That Mrs. King did not file this petition on the eve of foreclosure, but approximately three weeks before, also implies an intent to reorganize rather than solely to frustrate the foreclosure sale of the property.[11]  In contrast to other serial filing imputation cases, Mrs. King's chapter 13 petition does not effect an end run around a bar order entered in Mr. King's last case, as neither was one entered nor even requested.  See In re Felberman, 196 B.R. at 685 (wife filed bankruptcy after prospective relief granted mortgagee in husband's third case).

Accordingly, the evidence presented does not warrant concluding that Mrs. King is a serial bankruptcy filer who is abusing federal law solely to thwart the legitimate state law rights held by Midfirst Bank.

Moreover, were it necessary for Mrs. King to prove a material change in circumstances between this case and Mr. King's prior cases, I note that during those earlier cases, it does not appear that Mrs. King's income was utilized by Mr. King as part of the reorganization effort.  In this filing, Mrs. King will apply her income and compel

---

[10]Subsequent to the hearing in this matter, on June 15, 2006, the trustee filed his own motion to dismiss.  The grounds for dismissal did not include failure to make plan payments.

[11]When a debtor files a bankruptcy petition the day before a sheriff sale, it usually compels a postponement of the sale by making it very difficult for the mortgagee to obtain emergency relief from the stay, even when the bankruptcy filing is in bad faith.  A debtor's filing a chapter 13 petition three weeks prior to the sale date, however, affords the mortgagee an opportunity for quick relief from an abusive filing.

16

Mr. King's contribution by wage garnishment. Plus, she has some settlement proceeds to assist in this reorganization. These differences again support a finding of good faith.

As do both the chapter 13 trustee and Midfirst Bank, however, I have some reservations concerning her ability to reorganize successfully.

As Midfirst Bank observed at the hearing, Mrs. King's estimate of her mortgage arrears may be too low. Currently, Mrs. King proposes to pay $567 per month. This would total $34,020 over the life of the plan. While the validity of Midfirst Bank's asserted arrearage claim of $44,919.36 has not been determined, it is probable that the pre-bankruptcy mortgage delinquency increased since Mr. King's last case, when it was approximately $32,000. In addition, Citadel Federal Credit Union has filed a secured claim of $1,585.93. If both secured claims were allowed as filed, Mrs. King would need to pay more than $775 per month in plan payments, exclusive of the trustee's commission and any other administrative claims.

Additionally, I agree with the trustee that it is difficult to compute Mrs. King's disposable income from the evidence presented. Her monthly gross wages may be as much as $350 less than the $1,906 she scheduled.[12] Mrs. King also admitted that her overtime hours were inconsistent, and thus difficult to average. These potential deductions in income may be offset by the $100-$500 Mrs. King testified she receives in mileage reimbursement each month.

And like the trustee, I note that it is highly unlikely that the debtor's expenses estimate found on Schedule J is accurate. For example, the debtor discloses no

---

[12]Sixty-five hours every two weeks times $11/hour equals $715; annualized that equals $18,590; divided by 12 equals $1,549.16. This, of course, does not take into account payroll deductions.

17

expense for clothing or medical and dental co-pays.  Mrs. King must purchase some

clothing for herself, even with wearing uniforms to work; and she and her children must

have medical and dental appointments that cost her in co-pays: indeed, she mentioned that

she had just finished paying off her son's braces.  Hearing at 4:44.  Finally, though

frugality is commendable, the $280 budgeted for food for two teenagers and one adult,

plus a visiting college student, seems unreasonably low.

   On the other hand, Mrs. King may have more funds to devote to her

reorganization plan, considering her testimony that her $180 electricity and heating fuel

expense was overstated by a "little," while her $160 water and sewer expense may have

been overstated by half.  Most significantly, Mrs. King no longer pays $493.46 in

scheduled monthly car payments.  With the other reduced expenses, over $500 in

additional funds may be available to devote to the plan—possibly making up for any

deficiencies in her income disclosures.

   Although I will deny Midfirst Bank's motion to dismiss, the chapter 13

trustee will insist upon the debtor' need to clarify her disposable income prior to

confirmation of any plan and to prove its feasibility.  11 U.S.C. §§ 1325(a)(6), (b).[13]  At

this point, however, the totality of the circumstances support allowing this case to

continue.  See In re Powers, 135 B.R. 980, 991 (Bankr. C.D. Cal. 1991) ("'But if it is

apparent that the purpose is not to delay or defeat creditors, but rather to put an end to

long delays, administrative expenses . . . to mortgage foreclosures, and to invoke the

operation of the [bankruptcy law] . . . to attempt to effect a speedy efficient

---

[13]Indeed, he has already moved to do so, which motion is scheduled to be heard
later this month.

18

reorganization, upon a feasible basis . . . good faith cannot be denied.'") (quoting <u>In re</u>

<u>Loeb Apartments</u>, 89 F.2d 461, 463 (7th Cir. 1937).

An order consistent with this memorandum will be issued.

UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| In re | : | Chapter 13 |
| NANCY KING | : | |
| Debtor | : | Bankruptcy No. 06-10711bif |

.................................................

ORDER

.................................................

AND NOW, this 11th day of July 2006, for the reasons stated in the
accompanying memorandum, it is hereby ordered that Midfirst Bank's motion to dismiss
this chapter 13 under 11 U.S.C. § 1307(c) as a bad faith filing is denied.


_____
BRUCE FOX
United States Bankruptcy Judge


Copies to:

Mrs. Nancy M. King
624 Felton Avenue
Sharon Hill, PA 19079

Patrick F. Lomax, Esq.
Law Offices of Patrick F. Lomax
11 South Olive St. - Suite 100
Media, PA 19063

Leslie E. Puida, Esq.
Mellon Independence Center
701 Market Street, Suite 5000
Philadelphia, PA 19106-1532

William C. Miller, Esq.
Chapter 13 Trustee
111 S. Independence Mall, Suite 583
Philadelphia, PA 19106